UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Eugene M. Gabriel,
     Claimant

     v.                              Civil No. 08-cv-171-SM
                                     Opinion No. 2009 DNH 019
Michael Astrue,
Commissioner, Social
Security Administration,
     Respondent


**O R D E R**


Pursuant to 42 U.S.C. § 405(g), claimant, Eugene M. Gabriel, moves to reverse the Commissioner's decision denying his applications for Social Security disability insurance benefits, or DIB, under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income, or SSI, under Title XVI, 42 U.S.C. § 1382. In the alternative, Gabriel asks the court to remand the case for a new administrative determination. The Commissioner, in turn, moves for an order affirming his decision. For the reasons given, the matter is remanded to the Administrative Law Judge ("ALJ") for further proceedings consistent with this opinion.


**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon
> the pleadings and transcript of the record, a judgment
> affirming, modifying, or reversing the decision of the
> Commissioner of Social Security, with or without
> remanding the cause for a rehearing.  The findings of
> the Commissioner of Social Security as to any fact, if
> supported by substantial evidence, shall be conclusive
> . . . .

42 U.S.C. § 405(g) (setting out the standard of review for DIB

decisions); see also 42 U.S.C. § 1383(c)(3) (establishing 42

U.S.C. § 405(g) as the standard of review for SSI decisions).

However, the court "must uphold a denial of social security . . .

benefits unless 'the [Commissioner] has committed a legal or

factual error in evaluating a particular claim.'"  Manso-Pizarro

v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan

v. Hudson, 490 U.S. 877, 885 (1989)).


     As for the statutory requirement that the Commissioner's

findings of fact be supported by substantial evidence, "[t]he

substantial evidence test applies not only to findings of basic

evidentiary facts, but also to inferences and conclusions drawn

from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-

18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730

(2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than

[a] mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate to support a

conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st

2

Cir. 1980) (quoting <u>Richardson v. Perales</u>, 402 U.S. 389, 401
(1971)).  Finally, when determining whether a decision of the
Commissioner is supported by substantial evidence, the court must
"review[] the evidence in the record as a whole."  <u>Irlanda Ortiz</u>
<u>v. Sec'y of HHS</u>, 955 F.2d 765, 769 (1st Cir. 1991) (per curiam)
(quoting <u>Rodriguez v. Sec'y of HHS</u>, 647 F.2d 218, 222 (1st Cir.
1981)).[1]


## Background

The parties have submitted a Joint Statement of Material
Facts (document no. 20).  That statement is part of the court's
record and will be summarized here, rather than repeated in full.


Eugene Gabriel is forty-eight years old.  When he was
eighteen, he was diagnosed with osteosarcoma, and his left leg
was amputated above the knee.  Since then, he has worn an above-
the-knee prosthesis.  Until approximately 1996, he had regular
follow-up care, but has not had any since then.  In November,
2006, he was diagnosed with diabetes, based upon a finding of a

---

[1] "It is the responsibility of the [Commissioner] to
determine issues of credibility and to draw inferences from the
record evidence.  Indeed, the resolution of conflicts in the
evidence is for the [Commissioner], not the courts."  <u>Irlanda</u>
<u>Ortiz</u>, 955 F.2d at 769 (citations omitted).  Moreover, the court
"must uphold the [Commissioner's] conclusion, even if the record
arguably could justify a different conclusion, so long as it is
supported by substantial evidence."  <u>Tsarelka v. Sec'y of HHS</u>,
842 F.2d 529, 535 (1st Cir. 1988).

glucose HbA1C4 level of 6.4 by a laboratory which reported the
normal range as 4.8 – 6.0.

At the time of his hearing, Gabriel was working part-time in
the seafood department at a grocery store.  Typically, he worked
two four-hour days in a row, followed by a day off, and then
worked two more four-hour days, followed by two days off.  Before
his job at the grocery store, Gabriel worked at a pizza
restaurant that allowed him flexible hours and provided a number
accommodations that permitted him to take care of his stump,
which tended to blister and bleed if he wore his prosthesis for
too long.  Cursory examination of Gabriel's Social Security
earnings record suggests that he had approximately twenty
different jobs between 2002 and 2006.  (Administrative Transcript
(hereinafter "Tr.") at 98-101.)

In August, 2006, Gabriel filed the applications for benefits
that give rise to this case.  In disability reports filed with
the SSA, he stated that his ability to work was limited because:
(1) he could not get around without his prosthetic leg; and (2)
"[b]listers on the bottom of [his] stump cause[d] him not to be
able to put [his] prosthetic on."  (Tr. at 127, 165.)  In
February, 2007, Gabriel was examined by Dr. Ralph Wolf, a
consultative physician.  The next month, Dr. J. DeBorja, a non-

4

examining physician, conducted a Physical Functional Capacity

Assessment based solely on the records.

Dr. Wolf began his report with the following recitation of

Gabriel's medical history:

> This 47-year-old chef noted increasing pain at the
> distal left thigh for one and one-half years prior to
> examination.
>
> The patient had received an AK amputation in 1977 for
> an osteosarcoma at this site and has worn an above-the-
> knee prosthesis full-time since age 18.  The patient's
> pain increasingly interfered with his work as a chef.
> Additionally, sitting work was difficult with the
> prosthesis in place because of the rigid posterior
> aspect of the thigh portion of the prosthesis (socket);
> prolonged sitting work was also not possible without
> removing the patient's prosthesis.  The patient's pain
> originally was not relieved with prosthetic
> adjustments.

(Tr. at 209.)  Dr. Wolf's physical examination revealed the

following:

> Moderate left thigh atrophy was noted.  A healed Y-
> shaped posterior incision was present at the distal
> stump.  Slight tenderness was present distally.  No
> erythema[2] or skin wounds were noted.  Normal left hip
> flexion, abduction, adduction, and rotation were
> present.  The patient ambulated with an antalgic gait[3]

---

[2] "Erythema" is defined as "redness due to capillary
dilation."  DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 615 (30th ed.
2003).

[3] An "antalgic gait" is a limp adopted so as to avoid pain.
See id. at 747.

using the above-the-knee prosthesis without the use of
cane or crutches.

(Id.)  Dr. Wolf gave the following diagnosis:  "(1) Status

postoperative above-knee amputation for left leg osteosarcoma.

(2) Diabetes mellitus."  (Id. at 210.)  He concluded his report

with the following recommendation:

> The patient is disabled for continued standing and
> walking work and may perform sitting work only without
> his prosthetic leg because of ongoing discomfort at the
> end of the left thigh stump.  Some pain in the left leg
> is likely to persist with prolonged weightbearing and
> prolonged sitting, chronically.

(Id.)


     Dr. DeBorja, a non-examining physician, provided both a

narrative case analysis and a Medical Source Statement of Ability

to do Work-Related Activities (Physical).  Dr. DeBorja's case

analysis includes the following assessment:

> Claimant is a 47 year old male who alleges inability to
> use prosthesis as it causes blistering of his stump.
> Claimant's allegations are not fully credible.  This is
> primarily due to lack of evidence to support his
> statement.  First the physical evidence failed to
> establish the presence of such blistering.  There is no
> evidence that he was seen or treated at all for the
> allege[d] problem.  On 11/17/06 when he was seen for
> abdominal pain it was noted that he has a left AKA but
> he maneuvers well.  A CE by Dr. Wolf [f]ailed to
> establish the presence or residuals of that blistering.
> Except for moderate atrophy of the thigh which is
> expected, the [amputation site] is healed and there was
> no erythema or skin wounds noted.  A[s] noted he was

able to ambulate albeit with an antalgic gate without
need for cane or crutches.  There is no evidence that
[the] prosthesis was causing much problem sitting for
the same reasons mentioned above, i.e. no evidence of
ulceration, erythema or blistering. . . .

. . . .

Claimant's impairment is severe but not listing level.
The HA 1151 provided are consistent with  Dr. Wolf['s]
MSS.  Except for the statement of being disabled which
is a statement reserved for the commissioner
limitations on prolonged weight bearing is adhered too.
Claimant can sit without bending the knee much.  If
this were a real problem there is no reason why the
prosthetic device cannot be adjusted by a prosthetist.[4]

(Tr. at 211-12.)


     At his hearing, Gabriel testified that he could keep his

prosthesis on for six hours a day, or up to eight hours if he

pushed it, and that he did not wear his prosthesis at home.  He

also testified that if he wore his prosthesis for six hours, he

would develop blisters on his stump that would become inflamed,

irritated, and subject to bleeding, and that if he wore his

prosthesis for six hours one day, he would have to leave it off

the next day, to allow his stump to heal.  He observed that as he

has gotten older, the problem with blistering has intensified,

and that he does not heal as quickly as he did when he was

---

     [4] Dr. Wolf noted that Gabriel's pain had not been relieved
with prosthetic adjustment.  (Tr. at 209.)  And, at his hearing,
Gabriel testified that he was seeing a prosthetic specialist at
First Step in Manchester.  (Tr. at 12.)

younger.  In addition, he described how the design of his prosthesis causes him pain, rashes, and blisters when he wears it while sitting.  Finally, he explained that he did not have blisters or sores on his stump when he was examined by Dr. Wolf because he was not working at that time and, as a result, not stressing his stump.

After the hearing, the ALJ issued a decision which included the following findings:

> 3.  The claimant has the following severe impairment: left leg amputation at the knee (20 CFR 404.1520(c) and 416.920(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404 Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
>
> 5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform sedentary work except that he is unable to effectively use left foot controls.
>
> . . . .
>
> 10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c); and 416.966).

(Tr. at 39–42.)

The ALJ did not support his step–three determination, _i.e._, that Gabriel's severe impairment did not meet or equal a listed impairment, with any specific factfinding or analysis.  (_Id._ at 40.)  On the other hand, the ALJ supported his step–five determination, _i.e._, that Gabriel was capable of performing jobs that exist in significant numbers in the national economy, with a finding that "the claimant's statements concerning the intensity, persistence, and limiting effects of [his] symptoms are not entirely credible."  (_Id._ t 41).  Thus, the ALJ appears not to have credited Gabriel's statements that he suffered from pain and developed a rash when he wore his prosthesis while sitting.  As a consequence, the ALJ did not explore the area of sedentary jobs that require no standing or walking, _i.e._, jobs that an amputee could perform without using a prosthesis.  The ALJ found Gabriel to be less than credible because "[t]here is no evidence that the claimant has been seen or treated for the blistering, redness, and bleeding that occurs to his stump with prolonged use of his prosthesis."  (_Id._)  In addition, the ALJ declined to give significant weight to Dr. Wolf's opinion, explaining that "there is no evidence of treatment for the skin breakdowns the claimant alleges."  (_Id._)

**Discussion**

According to Gabriel, the ALJ's decision should be reversed, and the case remanded, because the ALJ: (1) incorrectly determined that he did not have a listed impairment; (2) failed properly to consider diabetes as part of his combination of impairments; and (3) gave insufficient weight to the opinion of an examining physician when determining that he had the residual functional capacity to perform sedentary work.[5]

_____

[5] The parties' statements of the issues in this case do not line up as precisely as usually expected.  According to claimant, the issues are these:

1.   Did the ALJ err when he failed to find that the [claimant] met or equaled a listing and instead found that the claimant had a residual functional capacity to perform sedentary work and in doing so gave improper weight to the only examining doctor's opinion on disability?

2.   Did the ALJ err when he found that the claimant had a residual functional capacity to perform sedentary work when he failed to properly analyze claimant's combination of impairments, which include[s] diabetes?

(Cl.'s Mem. (document no. 17-2) at 4.)  According to the Commissioner, the issues are these:

1.   Whether [claimant] failed to carry his burden of proving that he had an impairment or combination of impairments which met or equaled Listing 1.05.

2.   Whether substantial evidence supports the ALJ's determination that [claimant] could perform sedentary work.

3.   Whether the ALJ gave proper weight to the opinion of a physician who examined [claimant] on one occasion.

To be eligible for disability insurance benefits, a person must: (1) be insured for such benefits; (2) not have reached retirement age; (3) have filed an application; and (4) be under a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  To be eligible for supplemental security income, a person must be aged, blind, or disabled, and must meet certain requirements pertaining to income and assets.  42 U.S.C. § 1382(a).  The question in this case is whether Gabriel was under a disability during the time for which he sought benefits.

For the purpose of determining eligibility for disability insurance benefits,

> [t]he term "disability" means . . . inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A); <u>see also</u> 42 U.S.C. § 1382c(a)(3)(A) (setting out a similar definition of disability for determining eligibility for SSI benefits).  Moreover,

> [a]n individual shall be determined to be under a disability only if his [her] physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience,

---

(Resp't's Mem. (document no. 19-2) at 2.)

> engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of
> whether such work exists in the immediate area in which
> he lives, or whether a specific job vacancy exists for
> him, or whether he would be hired if he applied for
> work. . . .

42 U.S.C. § 423(d)(2)(A) (pertaining to DIB benefits); see also

42 U.S.C. § 1382c(a)(3)(B) (setting out a similar standard for

determining eligibility for SSI benefits).

In order to determine whether a claimant is disabled for the

purpose of determining eligibility for either DIB or SSI

benefits, the Commissioner is required to employ a five-step

process.  See 20 U.S.C. §§ 404.1520 (DIB) and 416.920 (SSI).

> The steps are: 1) if the [claimant] is engaged in
> substantial gainful work activity, the application is
> denied; 2) if the [claimant] does not have, or has not
> had within the relevant time period, a severe
> impairment or combination of impairments, the
> application is denied; 3) if the impairment meets the
> conditions for one of the "listed" impairments in the
> Social Security regulations, then the application is
> granted; 4) if the [claimant's] "residual functional
> capacity" is such that he or she can still perform past
> relevant work, then the application is denied; 5) if
> the [claimant], given his or her residual functional
> capacity, education, work experience, and age, is
> unable to do any other work, the application is
> granted.

Seavey v. Barnhard, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20

C.F.R. § 416.920).  The claimant bears the burden of proving that

he is disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).

He must do so by a preponderance of the evidence.  See Mandziej
v. Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> In assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) plaintiff's subjective
> claims of pain and disability as supported by the
> testimony of the plaintiff or other witness; and (3)
> the plaintiff's educational background, age, and work
> experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690 F.2d
5, 6 (1st Cir. 1982)).


A. Step Three: Meeting a Listed Impairment

Gabriel argues that the ALJ erred, at step three, by
determining that he did not have a listed impairment.  More
specifically, claimant argues that based on Dr. Wolf's findings
and opinions, and his own testimony, the ALJ should have found
that he was not able to ambulate effectively, which, in turn,
would have required a determination that his disability met or
equaled the listed musculoskeletal impairment of amputation.  The
Commissioner disagrees, contending that claimant failed to carry
his burden of proving that he suffered from a "medical inability
to use a prosthetic device to ambulate effectively."

13

At step three, "if the impairment meets the conditions for one of the 'listed' impairments in the Social Security regulations, then the application is granted." <u>Seavey</u>, 276 F.3d at 5 (citation omitted).  Under the relevant regulations, "<u>[a]mputation (due to any cause)</u> . . . [of] [o]ne or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b" is a listed impairment of the musculoskeletal system.  20 C.F.R. § 404, Subpt. P, Appx. 1, § 1.05B.  Those same regulations explain that "[r]egardless of the cause(s) of a musculoskeletal impairment, functional loss for purposes of these listings is defined as the inability to ambulate effectively <u>on a sustained basis</u> for any reason, including pain associated with the underlying musculoskeletal impairment."  <u>Id.</u> § 1.00B2a (emphasis added).  The regulations provide the following relevant definitions:

> (1) <u>Definition</u>.  Inability to ambulate effectively means an extreme limitation of the ability to walk; <u>i.e.</u>, an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities.  Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities. . . .
>
> (2) <u>To ambulate effectively</u>, individuals must be capable of sustaining a reasonable walking pace over a

> sufficient distance to be able to carry out activities
> of daily living.  They must have the ability to travel
> without companion assistance to and from a place of
> employment or school.  Therefore, examples of
> ineffective ambulation include, but are not limited to,
> the inability to walk without the use of a walker, two
> crutches or two canes, the inability to walk a block at
> a reasonable pace on rough or uneven surfaces, the
> inability to use standard public transportation, the
> inability to carry out routine ambulatory activities,
> such as shopping and banking, and the inability to
> climb a few steps at a reasonable pace with the use of
> a single hand rail.  The ability to walk independently
> about one's home without the use of assistive devices
> does not, in and of itself, constitute effective
> ambulation.

Id. § 1.00B2b.


At his hearing, Gabriel testified that use of his prosthesis

for more than six hours at a time gave him blisters on his stump

that would open and bleed, and that after wearing his prosthesis

for a day, he would have to refrain from wearing it the next day,

to let the blistering heal.  (Tr. at 9, 11.)  He further

testified that his problem with blistering first cropped up about

fifteen years ago and has become progressively worse.  (Id. at

13.)  He also testified that he takes his prosthesis off at home

(id. at 11, 23), and described how his part-time work schedule –

four-hour work days, never more than two in a row – allowed him

to care for his stump and keep the blistering to a minimum (id.

at 25-26).  And, in his opening statement, Gabriel's

representative explained that Dr. Wolf conducted his examination

15

at a time when Gabriel was not working and, as a result, was not
stressing his stump.

As noted above, the ALJ presented no factfinding or analysis
in support of his determination that Gabriel's amputation did not
meet or equal a listed impairment.  In response to claimant's
appeal, however, the Commissioner contends that the evidence of
record does not support a conclusion that Gabriel was not able to
ambulate effectively.  Specifically, he cites evidence concerning
Gabriel's ability to: (1) walk three or four blocks; (2) take
walks three times a week; (3) shop at a neighborhood convenience
store; (4) go to a social club once a week; (5) work part-time in
three- to four-hour shifts in a grocery store seafood department;
(6) take a bus to work; (7) work part-time at a concession stand
at the Verizon Wireless Arena.  He also cites Dr. Wolf's
observation that Gabriel was able to ambulate, and to a medical
note – developed during an emergency room visit for abdominal
pain – indicating that Gabriel was able to maneuver well.  The
Commissioner further notes Dr. DeBorja's residual functional
capacity assessment, described above.  Finally, in reliance upon
Seavey, 276 F.3d at 10, the Commissioner points out that any
conflicts in the evidence were for the ALJ to resolve.

The problem with the Commissioner's position is that the ALJ did not resolve the conflicts in the evidence on this issue because, as in Audler v. Astrue, "[t]he ALJ did not identify the listed impairment for which [Gabriel]'s symptoms fail[ed] to qualify, nor did [he] provide any explanation as to how [he] reached the conclusion that [Gabriel]'s symptoms are insufficiently severe to meet any listed impairment."  501 F.3d 446, 448 (5th Cir. 2007).  As the Audler court explained, "[s]uch a bare conclusion is beyond meaningful judicial review."  Id. (quoting Clifton v. Chater, 79 F.3d 1007, 1009 (10th Cir. 1996)). The court continued:

> Under the Social Security Act,
>
> [t]he Commissioner of Social Security is directed to make any findings of fact, and decisions as to the rights of any individual applying for a payment under this subchapter.  Any such decision by the Commissioner of Social Security, which involves a determination of disability and which is in whole or in part unfavorable to such individual shall contain a statement of the case, in understandable language, setting forth a discussion of the evidence, and stating the Commissioner's determination and the reason or reasons upon which it is based.
>
> 42 U.S.C. § 405(b)(1).  By the explicit terms of the statute, the ALJ was required to discuss the evidence offered in support of Audler's claim for disability and to explain why she found Audler not to be disabled at that step.  Although the ALJ is not always required to do an exhaustive point-by-point discussion, in this case, the ALJ offered nothing to support her conclusion at this step and because she did not, "we, as a reviewing court, simply cannot tell whether her decision is based on substantial evidence or not."

<u>Cook v. Heckler</u>, 783 F.2d 1168, 1172 (4th Cir. 1986).

<u>Id.</u>; <u>see also</u> <u>Burnett v. Comm'r of SSA</u>, 220 F.3d 112, 120 (3d Cir. 2000) ("Because we have no way to review the ALJ's hopelessly inadequate step three ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning supporting a determination that Burnett's 'severe' impairment does not meet or is not equivalent to a listed impairment.  On remand, the ALJ shall fully develop the record and explain his findings at step three . . .") (footnote omitted); <u>Cox v. Astrue</u>, Civil Action No. 08-10400-DPW, 2009 WL 189958, at *5 (D. Mass. Jan. 16, 2009) (describing the ALJ's duty to "consider all relevant medical and non-medical evidence when evaluating a claimant's disability," to "'explicitly indicate' the weight he gives to all 'relevant evidence,'" and to "consider the conflicts in the evidence and resolve them") (citations omitted).

In <u>Audler</u>, the court held that the ALJ's failure to provide findings and analysis to support a step-three determination was not harmless.  501 F.3d at 448-49 (citing <u>Morris v. Bowen</u>, 864 F.2d 333, 334 (5th Cir. 1988); <u>Mays v. Bowen</u>, 837 F.2d 1362, 1364 (5th Cir. 1988)).  Consequently, the court of appeals remanded the case to the district court with instructions to remand to the Commissioner.  <u>Audler</u>, 501 F.3d at 449.  As in <u>Audler</u>, the ALJ's

18

error in this case is not harmless.  While the ALJ determined
that Gabriel had the residual functional capacity to perform
sedentary work, that determination, no matter how well founded,
does not support the step-three determination that stump
complications from Gabriel's amputation did not render him
disabled under listing 1.05.  Moreover, given the definition of
"functional loss . . . as the inability to ambulate effectively
<u>on a sustained basis</u>," 20 C.F.R. § 404, Subpt. P, Appx. 1, §
1.00B2a (emphasis added), any determination that Gabriel was able
to ambulate effectively on a sustained basis would have to take
into account his testimony that six hours of prosthesis use gives
him blisters and that he would have great difficulty using his
prosthesis for two six-hour days in a row.  See <u>Audler</u>, 501 F.3d
at 448.  At least on the face of it, it would not seem that a
person who is able to use his prosthesis for no more than six
hours out of every forty-eight is able to ambulate effectively on
a sustained basis.

The ALJ did say that he found Gabriel's testimony about
blistering less than credible because there was no evidence that
he had ever been seen by a doctor or treated for blistering or
any other side-effects of prolonged use of his prosthesis.  But,
on the other hand, the ALJ did not mention, much less find
incredible, Gabriel's explanation that he had no blistering when

he saw Dr. Wolf because he was making a concerted effort to avoid stressing his stump at the time of the examination.[6]  To make a sustainable step-three determination, the Commissioner must consider Gabriel's explanation for the lack of medical documentation of his blistering and, if appropriate, explain why he finds that explanation to lack credibility.  Then, it will be necessary to make further findings concerning the circumstances under which Gabriel is subject to blistering of his stump due to prosthesis use and then determine whether, in light of those findings, Gabriel is or is not able to ambulate effectively on a sustained basis.

To conclude, because the ALJ presented no findings or analysis to support his step-three determination, this case must be remanded.  Of course, it goes without saying that if Gabriel is not disabled, he should not be awarded benefits.  But, on the other hand, if he is disabled, it seems unfair for him to be denied benefits simply because he has found ways to minimize the stump complications associated with wearing his prosthesis.

---

[6] Similarly, in making his determination that Gabriel had a residual functional capacity for sedentary work, the ALJ did not treat as fully credible Gabriel's statements about the effects of wearing his prosthesis while sitting, citing the lack of objective medical evidence of those effects.  (Tr. at 41.)  But, again, the ALJ did not address claimant's reasonable explanation for the lack of objective medical findings: his avoidance of situations that led to those symptoms around the time he saw Dr. Wolf.

B.  Gabriel's Remaining Arguments

Because this case is being remanded for a proper step-three determination, it is unnecessary to address claimant's remaining arguments.  See Audler, 501 F.3d at 449.  Nevertheless, the following observations may be of use to the parties on remand.

First, the ALJ does not appear to have erred in his consideration of Gabriel's diabetes.  While the ALJ does seem to have mischaracterized Gabriel's HgA1C level as being in the normal or therapeutic range, when lab reports showed an HA1C level of 6.4 and a reference range of 4.8 to 6.0,[7] that minor factual error is of no moment.  For one thing, the record also contains a case analysis by Dr. Ipakchi, presumably a non-examining physician, who opined:  "Recently diagnosed diabetes with no evidence of end organ damage is non-severe impairment."  (Tr. at 220.)  Thus, whether or not the ALJ was correct in his finding concerning the medical implications of a 6.4 HgA1C level, there is substantial evidence in the record supporting a determination that Gabriel's diabetes was a non-severe impairment.  Moreover, while claimant criticizes the ALJ for failing to take into account the negative consequences that

---

[7] In their Joint Statement of Material Facts, the parties agreed that Gabriel "was treated in the emergency room for pancreatitis and with an abnormal glucose HbA1C4 level of 6.4 from a lab whose norms are 4.8 – 6.0"  (Jt. Statement at 4 (citing Tr. at 189).)

diabetes could have on his ability to heal, there is no evidence in the record to that effect.[8]  And, in any event, whether or not diabetes can affect a person's ability to heal, the ALJ did make a finding, supported by his credibility determination, that claimant did not demonstrate that he suffered from blistering on his stump, thus making his ability to heal immaterial in the context of the decision the ALJ reached.  In sum, it does not appear that the ALJ committed a serious error in his consideration of claimant's diabetes.

Claimant also criticizes the ALJ's reliance on Dr. DeBorja's assessment to make his step-five determination, and also criticizes the ALJ's decision not to give significant weight to Dr. Wolf's opinion because it was not supported by the rest of the medical evidence.  Whether or not the ALJ properly declined to give significant weight to Dr. Wolf's opinion and the quality of the medical evidence on which that opinion is based are questions for another day.  However, as with the step-three determination discussed above, a properly supported step-five determination must also account for claimant's explanation for the lack of medical evidence of the soreness and rash he claims to get from wearing his prosthesis while seated.

---

[8] In his memorandum of law, claimant cites to a web site that discusses the effects of diabetes, but no such evidence was introduced at his hearing.

## Conclusion

For the reasons given, claimant's motion to remand for a new administrative determination (document no. 17) is granted, and the Commissioner's motion to affirm his decision (document no. 19) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), this matter is remanded to the ALJ for further proceedings.  The Clerk of the Court shall enter judgement in accordance with this order and close the case.


**SO ORDERED.**


_____
Steven J. McAuliffe
Chief Judge

February 24, 2009

cc:  Maureen R. Manning, Esq.
     T. David Plourde, Esq.